## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

RONALD HERTZOG,

Defendant.

No. 4:22-CR-00054

(Chief Judge Brann)

## MEMORANDUM OPINION

### AUGUST 27, 2024

## I.  BACKGROUND

On February 10, 2022, a Grand Jury sitting in the Middle District of Pennsylvania returned a one-count indictment with forfeiture allegations against Defendant Ronald Hertzog, charging him with one count of Possession of Firearms and Ammunition by a Convicted Felon in violation of 18 U.S.C. § 922(g)(1).[1] Hertzog then appeared before United States Magistrate Judge William I. Arbuckle on February 17, 2022 to plead not guilty to this count.[2]

On December 1, 2023, Hertzog filed two pretrial motions: a Motion to Dismiss the Indictment[3] and a Motion to Suppress Physical Evidence and Statements.[4] These motions are now ripe for disposition; for the reasons that follow, both motions are denied.

---

[1]  Doc. 13 (Indictment with Forfeiture Allegations).
[2]  Doc. 19 (Not Guilty Plea Entered).
[3]  Doc. 42 (Motion to Dismiss Indictment).
[4]  Doc. 44 (Motion to Suppress Evidence).

## II.     DISCUSSION

### A.     Factual Background

United States Customs and Border Protection intercepted a suspicious package from China addressed to Ronald Hertzog's home address in State College, Pennsylvania in January 2022.[5] Although its manifest stated "GIRL'S SKIRTS AND DIVIDED SKIRTS OF COTTON," the package contained two suspected firearm silencers.[6] Hertzog is unable to possess firearms due to a 2002 conviction for Possession of Unregistered Firearms; for that offense, he was sentenced to seventy months of imprisonment and thirty-six months of supervised release.[7]

#### 1.     2002 Possession of Unregistered Firearms

Hertzog's 2002 conviction traces back to his alleged leadership role with the Pennsylvania Citizens Militia.[8] After learning of the Militia's "preliminary plans to blow up the [Federal Bureau of Investigation ("FBI")] State College Office[,]" Hertzog was arrested, and a search of his property allegedly uncovered "a homemade silencer, several machine gun-type weapons, a machine gun receiver, three additional rifles" with instructions on how to convert them into "fully-automatic weaponry," a stockpile of over one-hundred rounds of bullets including some armor-piercing ammunition, several inert grenades, and … books on how to

---

[5]     Doc. 50 (Brief in Opposition to Motion to Suppress), Ex. 1 (Warrant) at 14-15.

[6]     *Id.* at 15. *See also* Doc. 72 (Evidentiary Hearing Transcript) at 8:22-9:9.

[7]     *Id.* at 16.

[8]     Doc. 50 (Brief in Opposition to Motion to Suppress) at 3. *See also* Doc. 72 (Evidentiary Hearing Transcript) at 11:13-20.

create and hide illegal weaponry."[9] The United States Court of Appeals for the Third Circuit did not disturb this Court's imposition of sentencing enhancements for "special skill, attempted obstruction, and possession of machine guns, armor-piercing ammunition, and black powder."[10]

### 2.    Release from Prison in 2007 through 2017

Following Hertzog's release from custody, the FBI continued to investigate him. According to Homeland Security Investigations Special Agent Christopher Dukes, the FBI believed that Hertzog remained a threat to national security and that he either possessed or may come to possess firearms or explosives.[11]

### 3.    Warrant Application

Dukes applied for a warrant to search Hertzog's home and detached garage on January 25, 2022.[12] In the application, Dukes identified the premises to be searched and items to be seized; explained his professional background; described how solvent traps can be converted into silencers;[13] expounded on international firearm smuggling techniques; and explained why probable cause existed.[14]

---

[9]  *Id.* at 4 (quoting *United States v. Hertzog*, 131 F. App'x 7, 8-9 (3d Cir. 2005)).

[10]  *Id.* at 4-5 (quoting *United States v. Hertzog*, 186 F. App'x 314, 318-319 (3d Cir. 2006)).

[11]  Doc. 72 (Evidentiary Hearing Transcript) at 75:23-76:5.

[12]  Doc. 50 (Brief in Opposition to Motion to Suppress), Ex. 1 (Warrant) at 8.

[13]  Solvent traps "are devices attached to the muzzle of a firearm barrel designed to catch or trap dirty cleaning solvent pushed through the barrel from the chamber end and out through the muzzle." *Id.* at 11. "Devices that have a hole in or indexing mark for a hole in the front endcap are classified as a 'firearm silencer' under the National Firearms Act (NFA)." *Id.* at 12.

[14]  *Id.* at 11-31.

To support his assertion that probable cause existed, Dukes discussed how United States Customs and Border Protection had intercepted a package from China that contained two suspected firearm silencers labeled as "GIRL'S SKIRTS AND DIVIDED SKIRTS OF COTTON" on the manifest.[15] Dukes also noted that United States Postal representatives had confirmed that Defendant received mail at the shipping address.[16] Photographs of the alleged silencers and the package were included in the warrant application.[17] Two other international packages shipped to Hertzog's address were also identified; one was intercepted, but it only contained a shower head.[18]

Dukes then explained that due to a 2002 felony conviction for Possession of Unregistered Firearms, Hertzog is prohibited from possessing a firearm.[19] When discussing this 2002 felony, he noted that Defendant had allegedly possessed a variety of firearms and "partially constructed improvised explosive devices."[20] Dukes further indicated that the United States Office of Probation and Pretrial Services discovered two-hundred rounds of ammunition at his residence in 2007.[21] Based on this information, Magistrate Judge Arbuckle approved the warrant on

---

[15] *Id.* at 15.
[16] *Id.* at 17.
[17] *Id.* at 15-16.
[18] *Id.* at 16.
[19] *Id.* at 17.
[20] *Id.* at 16-17.
[21] *Id.* at 17.

January 25, 2022 and authorized the seizure of any firearms, ammunition, and silencers from the residence and detached garage.[22]

### 4.    Surveillance Prior to the Execution of the Warrant

Prior to executing the search warrant, law enforcement conducted surveillance of Hertzog and his property.[23] This surveillance revealed that Hertzog lived at this residence with his wife and his elderly mother.[24]

### 5.    Safety Concerns

When deciding how to execute the search warrant, the officers considered the potential presence of "explosive materials [and] other IEDs" and the location of the residence "across the street from a school."[25] According to Dukes, how Hertzog's elderly mother would react also caused concern.[26] Since law enforcement was unsure "what volatile materials" were in the house or if there were "any other bombs," they approached the investigation with the "utmost caution"[27] and did not "just directly approach[] the door with him in the house."[28] "[B]ased on … the prior FBI [] investigation, the priorities were to have [Hertzog]

---

[22]  *Id.* at 2, 4-7.
[23]  Doc. 72 (Evidentiary Hearing Transcript) at 23:10-14.
[24]  *Id.* at 23:23-24:6.
[25]  *Id.* at 24:22-25.
[26]  *Id.* at 26:9-12.
[27]  *Id.* at 25:8-14.
[28]  *Id.* at 25:14-15.

separated from the house [and] also separated from his cell phone due to … the risk of [] remote controlled IEDs and other explosives."[29]

### 6.   Execution of the Warrant

At 1:50 p.m. on February 2, 2022, Dukes, the Ferguson Township Police Department, and State College Police Department stopped Hertzog approximately 2.5 miles away from his residence.[30] After immediately asking him to exit his vehicle,[31] Defendant was advised that a warrant had been issued to search his home and detached garage.[32] At 1:52 p.m., Dukes asked Hertzog if there was anything in the house that could hurt anyone.[33] Defendant only identified syringes in response to this question.[34] Right after this interaction, Dukes indicated that he "would be … interested in talking to him, maybe later on at the police department."[35] Hertzog eventually stated that he would like to speak with his attorney at 1:56 p.m.[36] Prior to being transported to the Ferguson Township Police Department, Hertzog was

---

[29]  *Id.* at 26:2-6.

[30]  *Id.* at 23:4-9, 26:19-27:7. *See also* Government Ex. 3 (Footage of Initial Traffic Stop) at 0:00:30, 0:01:43.

[31]  *Id.*

[32]  Government Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:00:51.

[33]  Doc. 72 (Evidentiary Hearing Transcript) at 41:3-7. *See also* Government's Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:00:55.

[34]  *Id.* at 41:24-42:7. *See also* Government's Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:00:53-0:01:09.

[35]  *Id.* at 27:23-28:2. *See also* Government's Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:01:22.

[36]  *Id.* at 43:22-25. *See also* Government's Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:05:19-0:05:23.

handcuffed and frisked at 1:59 p.m.[37] At that time, Hertzog's keys to his home and the detached garage were confiscated.[38]

Dukes, Hertzog, and the other officers arrived at the Ferguson Township Police Station at approximately 2:05 p.m.[39] After his attorney arrived at the station at approximately 3:30 p.m.,[40] Hertzog met with her in a private room.[41] His attorney eventually left the station following their conversation.[42]

The search warrant was executed later that day at 4:38 p.m.[43] To minimize the risk of frightening Hertzog's mother, a family member announced their presence after using the keys taken from Hertzog to enter the residence.[44] Despite allowing a civilian to enter first, law enforcement still used the "stack" formation "with a ballistic shield" for their own protection.[45] No ammunition or firearms were found inside the home, but the police found ammunition cans, ammunition, a reloader, suspected flechettes, shell casings, a primer, and a suspected cannon fuse

---

[37] *Id.* at 45:22-25. *See also* Government's Ex. 2 (Footage of Continuation of Initial Traffic Stop) at 0:07:54-0:07:59.

[38] *Id.* at 45:22-46:20, 47:18-21.

[39] *Id.* at 48:15-19.

[40] *Id.* at 49:1-4.

[41] *Id.* at 49:5-7.

[42] *Id.* at 49:10-12.

[43] Government's Ex. 1 (Footage of Search Warrant Execution) at 0:01:04.

[44] Doc. 72 (Evidentiary Hearing Transcript) at 81:11-13, 82:4-9. *See also* Government's Ex. 1 (Footage of Search Warrant Execution) at 0:01:00-0:01:10.

[45] *Id.* at 81:4-13, 81:17-20.

in the detached garage.[46] Law enforcement spotted the first ammunition can at 4:57 p.m.[47]

At some point that evening, Defendant was escorted outside the police station to smoke a cigarette.[48] Hertzog allegedly voluntarily told an officer that he "just ordered the things to see what they looked like" and said something "about having guns and his attorney was helping him dispose of them …."[49] Defendant was arrested at approximately 9:00 p.m.[50]

### 7. Charging Hertzog

A criminal complaint charging Hertzog with Possession of a Firearm by a Felon was filed on February 3, 2022.[51] A Grand Jury sitting in the Middle District of Pennsylvania returned a one-count indictment against Defendant on February 10, 2022.[52]

### B. Motion to Dismiss the Indictment

Federal Rule of Criminal Procedure 7(c) requires an indictment to "be a plain, concise, and definite written statement of the essential facts charged."[53] "[A]n indictment is deemed sufficient so long as it '(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he

---

[46]  *Id.* at 86:23-87:3, 87:8-12, 88:22-25, 89:2-15, 90:2-91:9,
[47]  Government's Ex. 1 (Footage of Search Warrant Execution) at 0:07:15-0:07:21.
[48]  Doc. 72 (Evidentiary Hearing Transcript) at 102:19-23.
[49]  *Id.* at 106:2-10.
[50]  *Id.* at 72:2-4.
[51]  Doc. 1 (Criminal Compl.).
[52]  Doc. 13 (Indictment with Forfeiture Allegations).
[53]  FED. R. CRIM. P. 7(c).

must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution.'"[54] "Moreover, 'no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution.'"[55]

Hertzog challenges the indictment under Federal Rule of Criminal Procedure 12(b)(3)(B) on the grounds that "the undisputed facts do not give rise to the offense charged" in the one-count indictment.[56] "Importantly, motions alleging a failure to state an offense test only the government's allegations, not its proof."[57] As such, "[a] pretrial motion to dismiss is not a permissible vehicle" to address "the sufficiency of the government's evidence," to make "credibility determinations" or to weigh proof unless there is a stipulated record or immunity issues are implicated.[58] Without a criminal equivalent to the summary judgment mechanism, "[t]he government is entitled to marshal and present its evidence at

---

[54] *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016) (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)).

[55] *United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) (quoting *United States v. Kemp*, 500 F.3d 257, 280 (3d Cir. 2007); *Rankin*, 870 F.2d at 112).

[56] Doc. 42 (Motion to Dismiss Indictment) ¶ 19.

[57] *United States v. Treadwell*, Crim. No. 1:19-CR-318, 2021 U.S. Dist. LEXIS 36136, at *2 (M.D. Pa. Feb. 26, 2021) (Conner, J.) (citing *United States v. Huet*, 665 F.3d 588, 594-95 (3d Cir. 2012)).

[58] *Huet*, 665 F.3d at 595 (citing *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000); *Bergrin*, 650 F.3d at 265).

trial ….”[59] Thus, “[a] court must uphold an indictment ‘unless it is so defective that it does not, by any reasonable construction, charge an offense.’”[60]

### 1.    The Indictment Charges a Criminal Offense

The facts contained in the indictment clearly establish all the required elements of 18 U.S.C. § 922(g)(1). As such, to the extent Defendant has moved to dismiss the indictment under Rule 12(b)(3)(B)(V), the motion is denied.

### 2.    18 U.S.C. § 922(g)(1) and the Second Amendment

Defendant also brings a challenge to the constitutionality of 18 U.S.C. § 922(g)(1); in doing so, he relies on the Supreme Court of the United States' *New York State Rifle & Pistol Ass'n., Inc. v. Bruen*[61] decision and the United States Court of Appeals for the Third Circuit's en banc decision in *Range v. Att'y Gen. United States of America*[62] to argue that this statute violates the Second Amendment of the United States Constitution. The Court received supplemental briefing on this issue following the Supreme Court's release of its decision in *United States v. Rahimi.*[63]

---

[59]   *DeLaurentis*, 230 F.3d at 661.
[60]   *Treadwell*, 2021 U.S. Dist. LEXIS 36136, at *3 (quoting *United States v. Willis*, 844 F.3d 155, 162 (3d Cir. 2016)).
[61]   597 U.S. 1, 142 S. Ct. 2111 (2022).
[62]   69 F.4th 96 (3d Cir. 2023).
[63]   *United States v. Rahimi*, 602 U.S. _, 144 S. Ct. 1889, 219 L. Ed. 2d 351 (2024).

### a. Second Amendment Law under *Bruen*, *Range*, and *Rahimi*

"After *Bruen*, [I] must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the Government now bears the burden of proof: it 'must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.'"[64] To determine if a "new law is 'relevantly similar' to laws that our tradition is understood to permit," I must "'apply[] faithfully the balance struck by the founding generation to modern circumstances.'"[65] "Why and how the regulation burdens the right are central to this inquiry."[66]

But "analogical reasoning under the Second Amendment is neither a regulatory straitjacket nor a regulatory blank check."[67] The Government must "identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."[68] As

---

[64] *Range*, 69 F.4th at 101 (quoting *Bruen*, 597 U.S. at 24).
[65] *Rahimi*, 144 S.Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29).
[66] *Id.* (citing *Bruen*, 597 U.S. at 29).
[67] *Bruen*, 597 U.S. at 30.
[68] *Id.*

the Supreme Court emphasized in *Rahimi*, "[t]hese precedents were not meant to suggest a law trapped in amber."[69]

### b.    Facial Challenge

The Supreme Court has not "cast doubt on longstanding prohibitions on the possession of firearms by felons."[70] *Rahimi* reiterated that *District of Columbia v. Heller* "stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"[71] Notably, this observation in *Heller* is binding on this Court.[72] Despite not explicitly repeating that assertion, five justices of the current Supreme Court believed that *Bruen* did not alter this aspect of *Heller*.[73] Although its judgment has been vacated, nothing in *Range* would have commanded the Court to reach a different conclusion; it "did not purport to strike down § 922(g)(1), nor may it logically be read in such a manner."[74] In fact, three concurring judges in *Range* explicitly stated that "[a]ny historical inquiry" that determines that § 922(g)(1) is facially unconstitutional

---

[69]   *Rahimi*, 144 S. Ct. at 1897.

[70]   *District of Columbia v. Heller*, 554 U.S. 570, 626-27, 128 S. Ct. 2783, 171 L. Ed. 2d 637 (2008). *See also McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 786, 130 S. Ct. 3020, 177 L. Ed. 2d 894 (2010).

[71]   *Rahimi*, 144 S. Ct. at 1902.

[72]   *Range*, 69 F.4th at 110 (Ambro, J., concurring, joined by Greenaway and Montgomery-Reeves, JJ.) ("[i]n *United States v. Barton*, [the Third Circuit] held that '*Heller's* lists of 'presumptively lawful' regulations is not dicta.' 633 F.3d 168, 171 (3d Cir. 2011)).

[73]   *E.g.*, *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 U.S. Dist. LEXIS 160684, at *14 (M.D. Pa. Sept. 11, 2023).

[74]   *Id.* at *15.

"must be wrong in view of the answer the Supreme Court has already supplied."[75] The Third Circuit's recent decision in *United States v. Moore* reinforces this conclusion.[76] Given this guidance, the Court concludes that § 922(g)(1) remains facially constitutional.[77]

### c.    As Applied Change

Since the Government acknowledges that Hertzog is one of "the people" protected by the Second Amendment,[78] I will proceed directly to determining if a historical analogue exists.

"During the late seventeenth century, the English government repeatedly disarmed individuals whose conduct indicated that they could not be trusted to abide by the sovereign and its dictates."[79] This "English notion that the government could disarm those not considered law-abiding traveled to the American colonies."[80] Consequently, "certain broad classes of individuals were prohibited from carrying firearms" during the colonial and founding periods.[81] Colonial or

---

[75]   *Range*, 69 F.4th at 110.

[76]   *United States v. Moore*, No. 23-1843, 2024 U.S. App. LEXIS 19282 (3d Cir. Aug. 2, 2024) (precedential) (upholding the constitutionality of § 922(g)(1) in the face of an as applied challenge).

[77]   I note that many of my colleagues in this Circuit have reached a similar conclusion. *E.g.*, *United States v. Johns*, Crim. Action No. 22-10-RGA, 2024 U.S. Dist. LEXIS 127619 (D. Del. July 19, 2024) (Andrew, J.); *United States v. Barnes*, Crim. Action No. 23-12 (MN), 2024 U.S. Dist. LEXIS 118937, 2024 WL 3328593 (D. Del. July 8, 2024) (Noreika, J.); and *United States v. Thrones*, Crim. Action No. 24-cr-042-1, 2024 U.S. Dist. LEXIS 112283, 2024 WL 3204457 (E.D. Pa. June 25, 2024) (Goldberg, J).

[78]   Doc. 49 (Brief in Opposition to Motion to Dismiss Indictment) at 19.

[79]   *Range*, 69 F.4th at 120 (Krause, J., dissenting).

[80]   *Id.* at 122.

[81]   *Reichenbach*, 2023 U.S. Dist. LEXIS 160684, at *16.

state laws restricted firearm ownership by Loyalists,[82] Catholics,[83] Native Americans,[84] and African Americans,[85] particularly in southern states, during the relevant historical periods. These restrictions "were all targeted at groups that lawmakers deemed dangerous and disruptive to society and were aimed at protecting the public from violence and disorder."[86] Although Hertzog is correct that his underlying felony offense is a non-violent one, I nonetheless conclude that he is an individual that may be "deemed dangerous and disruptive to society …."[87]

First, any comparison between Hertzog and Range is unconvincing. Even if the Third Circuit does not substantially alter its decision in *Range*, Hertzog was found to have been in possession of unregistered firearms; this offense is not comparable to making a false statement in a food stamp application.[88]

More importantly, this Court imposed various upward departures to Hertzog's offense level when sentencing him for his 2002 felony conviction.[89] After holding a hearing in 2003, the Honorable James F. McClure, Jr. outlined his

---

[82] *Id.* at *17 (citing Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249, 263 (2020); Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 506 (2004)).

[83] *Id.* at *18-19 (citing Greenlee, *supra*, at 263; *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J. dissenting)).

[84] *Id.* at *19 (citing *Kanter*, 919 F.3d at 458 (Barrett, J. dissenting)).

[85] *Id.* (citing Greenlee, *supra*, at 269; Cornell & DeDino, *supra*, at 505).

[86] *Id.* (citing Greenlee, *supra*, at 262).

[87] *Id.* at *18.

[88] *Range*, 69 F.4th at 98.

[89] *United States v. Hertzog*, 4:02-cr-00153-JFM-1, ECF No. 82 (Transcript of May 31, 2005 Proceeding).

findings of fact and conclusions of law in support of these departures.[90] Defendant appealed this sentence, and the Third Circuit ordered this Court to re-sentence him in light of the Supreme Court's decision in *United States v. Booker*.[91] In 2005, this Court again imposed these upward departures when re-sentencing Hertzog; in doing so, the Court adopted the same reasoning it had used in 2003 at Hertzog's initial sentencing. Relevant to this analysis, Judge McClure found the following adjustments to Hertzog's base offense level to be supported by the factual record: a one level upward departure for endangering public safety; a one level upward departure for the possession of armor-piercing ammunition; a two-level increase for the use of special skill; and other increases in the base offense level due to the possession of additional firearms, weapons that would violate the National Firearms Act, and items that could be readily converted into a destructive device.[92] Upon a review of all of the relevant circumstances, I conclude that Hertzog qualifies as a "dangerous" individual that Congress may seek to disarm.

As to the "'how' and 'why' metrics set forth in *Heller* and re-iterated in *Bruen*, the historical analogues demonstrate that in [the seventeenth and eighteenth] centuries, lawmakers determined that the pre-existing right of an

---

[90] *United States v. Hertzog*, 4:02-cr-00153-JFM-1 (M.D. Pa. 2003), ECF Doc. 45 (Mem. Op. and Ord. Regarding Motion for Upward Departure).

[91] Hertzog had appealed his initial sentence and, in light of the decision of *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005), the Third Circuit ordered the district court to resentence him. *United States v. Hertzog*, 131 F. App'x 7 (2005).

[92] *United States v. Hertzog*, 4:02-cr-00153-JFM-1, ECF No. 82 (Transcript of May 31, 2005 Proceeding). *See also United States v. Hertzog*, 131 F. App'x 7 (3d Cir. 2005).

individual to possess a firearm could be restricted or prohibited in order to ensure the orderly function of society and prevent disruptions thereto."[93] "In modern society, Congress' intent in passing § 922(g) was to curb the 'grave problem' arising from the use of firearms by certain individuals."[94] As the United States Court of Appeals for the Eighth Circuit has noted:

> "In the Omnibus Crime Control and Safe Streets Act of 1968, Congress found that there was 'widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce,' and that 'the ease with which any person can acquire firearms other than a rifle or shotgun (including criminals…, narcotics addicts, mental defectives, … and others whose possession of such weapons is similarly contrary to the public interest) is a significant factor in the prevalence of lawlessness and violent crime in the United States." Congress found that 'only through adequate Federal control over interstate and foreign commerce in these weapons' could 'this grave problem be properly dealt with.'"[95]

---

[93]   *United States v. Davis*, 698 F. Supp. 3d 776, 789 (M.D. Pa. 2023) (Mariani, J.)

[94]   *Id.*

[95]   *Id.* (quoting *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023)). The accuracy of this discussion is not impacted by the Supreme Court's vacatur of the judgment in *Jackson* following its determination of *Rahimi. See also* S. Rep. No. 90-1097, at 2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2113-14. ("The principal purposes of title IV are to aid in making it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency, and to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States. The … ease with which any person can anonymously acquire firearms … is a matter of serious national concern. The existing Federal controls over interstate and foreign commerce in firearms are not sufficient to enable the States to effectively cope with the firearms traffic within their own borders through the exercise of their police power. Only through adequate Federal control over interstate and foreign commerce in firearms, and over all persons engaging in the business of importing, manufacturing, or dealing in firearms, can this problem be dealt with, and effective State and local regulation of the firearms traffic be made possible").

"It is axiomatic that Congress' concern as to the widespread trafficking of firearms and its correlation to violent crime encompasses those individuals who are convicted of a felony crime involving the unlawful possession of a firearm."[96]

Based on this analysis, the Court concludes that these "historical statutes disarming individuals who were deemed dangerous … are proper historical analogues to § 922(g)(1), and specifically to § 922(g)(1)'s application to" Hertzog.[97] "The analogue rests in the identification by the Government of persons who could be lawfully disarmed, specifically those who were deemed a threat to 'the orderly functioning of society,' irrespective of the differences between those who were perceived to fit within the status at the time of the Founding and the ratification of the 14th Amendment" and Hertzog today.[98]

Nothing in *Rahimi* compels me to reach a different conclusion. My decision is consistent with that decision's limited scope and my colleagues in this Circuit that have recently considered challenges to the constitutionality of § 922(g)(1).[99]

### C.    Motion to Suppress Analysis

Hertzog has also filed a motion to suppress evidence he contends was obtained in violation of his Fourth Amendment, Fifth Amendment, and Sixth Amendment rights. The Court held an evidentiary hearing on this motion on July

---

[96]   *Id.*

[97]   *Id.*

[98]   *Id.* (quoting *Range*, 69 F.4th at 110).

[99]   *E.g.*, *United States v. Slone*, Crim. No. 16-400, 2024 U.S. Dist. LEXIS 133071 (E.D. Pa. July 29, 2024).

17, 2024. Based on the representations made by counsel at this hearing, the Court will not reach the issues concerning the scope of the warrant and the statements allegedly made by Hertzog.

### 1.    The Search Warrant

"Under the Fourth Amendment, a search warrant must be issued on the basis of probable cause."[100] "To establish probable cause, a warrant application must show that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place.'"[101] "The probable cause assessment does not require direct evidence linking a place to be searched to a crime."[102] Instead, it is "typically inferred from 'the type of crime, the nature of the items sought, the suspect's opportunity for concealment[,] and normal inferences about where a criminal might hide [evidence].'"[103] Further "when reviewing an application [for a warrant], courts must … bear in mind that search warrants are directed, not at persons, but at property where there is probable cause to believe that instrumentalities or evidence of crime will be found."[104]

"Evidence will be suppressed under the exclusionary rule when suppression would further the exclusionary rule's primary objective: to deter Fourth

---

[100]  *United States v. Coles*, 264 F. Supp. 3d 667, 679 (M.D. Pa. 2017) (Conner, J.).
[101]  *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).
[102]  *Id.* (citing *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001)).
[103]  *Id.* (quoting *United States v. Stearn*, 597 F.3d 540, 554 (3d Cir. 2010)).
[104]  *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir. 1983).

Amendment violations."[105] "One instance where suppressing evidence will not encourage deterrence is where the government acted 'upon an objectively reasonable good faith belief in the legality of [its] conduct' when conducting a search."[106] Good faith does not exist "if a reasonably well-trained officer would realize the underlying affidavit was 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'"[107]

Since this "suppression motion poses no Fourth Amendment question of broad import," it is appropriate to "immediately turn to the question of whether the officers acted in good faith."[108] While Hertzog's prior conviction is approximately twenty-years old, this age is offset by its similarity to the suspected crime.[109] Further, "age alone does not determine staleness."[110] "Rather, other variables such as the nature of the crime and the type of evidence to be seized must also be examined."[111] Law enforcement expected to find additional evidence of firearms and related items at Hertzog's residence. Unlike other forms of contraband,

---

[105] *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019) (citing *Stearn*, 597 F.3d at 554 and *United States v. Katzin*, 769 F.3d 163, 170-71 (3d Cir. 2014)).

[106] *Id.* at 206 (quoting *Katzin*, 769 F.3d at 182).

[107] *United States v. Williams*, 3 F.3d 69, 74 (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984)).

[108] *United States v. Ali-White*, No. 3:23-CR-12, 2023 WL 6216716, at *4 (M.D. Pa. Sept. 25, 2023) (Mannion, J.) (quoting *United States v. Primo*, 223 F. App'x 187, 189 (3d Cir. 2007)).

[109] *United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993) ("This is especially so where, as in the matter presently before the court, the previous arrest or conviction involves a crime of the same general nature as the one which the warrant is seeking to uncover.").

[110] *United States v. Ruffin*, 664 F. App'x 224, 227 n.4 (3d Cir. 2016) (quoting *United States v. Harvey*, 2 F.3d 1318, 1322 (3d Cir. 1993)).

[111] *United States v. Calloway*, Crim. No. 2:20-80-3, 2022 U.S. Dist. LEXIS 56231, 2022 WL 897047, at *18 (W.D. Pa. Mar. 28, 2022) (citing *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002); *Harvey*, 2 F.3d at 1322).

firearms have no half-life; they would remain at the residence until directly removed. The disguised package noted as children's clothing shipped to Hertzog's home address heightened the likelihood of locating additional firearms and firearm parts at his residence. Finally, Special Agent Dukes was well-aware of the FBI's continued interest in Hertzog.[112] Therefore, the officers' good faith reliance on the warrant was justified, and the fruits of the search of Defendant's home and detached garage will not be suppressed.

### 2.   Scope of the Search Warrant

As noted above, Hertzog withdrew his objection to the scope of the search warrant.

### 3.   Warrantless Arrest

Defendant next challenges the length of his detention on February 2, 2022. As referenced above, before executing the search warrant, law enforcement stopped his vehicle, detained him on the side of the road, and transported him to a local police station. Hertzog has argued that this detention qualified as a warrantless arrest that requires the suppression of any derivative evidence. As the keys to his home and detached garage and the contraband found during the search raise distinct issues, I will evaluate them separately.

---

[112]  Doc. 72 (Evidentiary Hearing Transcript) at 75:22-76:5.

a.    **The Keys**

i.    **Investigatory Stop**

Under *Michigan v. Summers*,[113] certain detentions "incident to the execution of a search warrant" are permissible.[114] However, law enforcement is not permitted unlimited discretion to detain individuals in connection with a search warrant. In *Bailey v. United States*,[115] the Supreme Court of the United States decided that a "spatial constraint defined by the immediate vicinity of the premises to be searched" must be imposed on "detentions incident to the execution of a search warrant."[116] Notably, the Supreme Court concluded that an investigatory stop one mile away from the location to be searched was too far to be justified under *Summers*, although there was no discussion in *Bailey* of the possibility of the remote detonation of an explosive device.[117] Since I must adhere to this guidance from the Supreme Court, the Government is precluded from justifying Hertzog's detention under *Summers*.

---

[113] *Michigan v. Summers*, 452 U.S. 692, 101 S. Ct. 2587, 69 L. Ed. 2d 340 (1981).
[114] *Bailey v. United States*, 568 U.S. 186, 133 S. Ct. 1031, 185 L. Ed. 2d 19 (2013).
[115] *Id.* at 191-192.
[116] *Id.* at 201.
[117] *Id.* at 190.

### ii.   *Terry* Stop

"The standard for reasonable suspicion as required for a valid *Terry* stop is less demanding than the standard for probable cause."[118] "In determining whether an encounter is a *Terry* stop or a de facto arrest, 'the reasonableness of the intrusion is the touchstone of the inquiry, in that the need of law enforcement officials must be balanced against the burden of the affected citizens.'"[119] "A *Terry* stop can [also] become a *de facto* arrest if officers sufficiently intrude on a person's personal security."[120] "Under the exclusionary rule, evidence obtained outside the parameters of a *Terry* stop must be suppressed as fruit of the poisonous tree."[121]

There was no traffic violation that justified the initial stop.[122] Instead, the Government has argued that reasonable suspicion existed to initially detain Hertzog. After considering the facts supporting the search warrant, Dukes' additional knowledge of the FBI's ongoing interest in Defendant, and law enforcement's concern about the presence of explosives in the residence, I agree.

---

[118] *United States v. Talley*, Crim. No. 16-316, 2016 U.S. Dist. LEXIS 169386, at *10-11 (E.D. Pa. Dec. 7, 2016) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)).

[119] *United States v. Torres*, 341 F. Supp. 3d 454, 462 (M.D. Pa. 2018) (Kane, J.) (citing *Gresh*, 2016 WL 1162320, at *4).

[120] *United States v. Sanchez*, Crim. No. 19-28-CFC, 2020 U.S. Dist. LEXIS 83345, at *6 (D. Del. May 12, 2020) (citing *United States v. Wrensford*, 866 F.3d 76, 85 (3d Cir. 2017)).

[121] *Talley*, 2016 U.S. Dist. LEXIS 169386, at *11 (citing *Wong Sun v. United States*, 371 U.S. 471, 485-86, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963))

[122] Doc. 72 (Evidentiary Hearing Transcript) at 69:8-10.

But "[a] *Terry* stop that is supported by reasonable suspicion at the outset may nonetheless violate the Fourth Amendment if it is excessively intrusive in its scope or manner of execution."[123] "However, an excessively intrusive *Terry* stop is not unconstitutional because its overly broad scope necessarily places a suspect under *de facto* arrest without probable cause …."[124] "Rather, an improperly executed *Terry* stop violates the Fourth Amendment because its scope is generally unreasonable under all of the circumstances."[125]

Under the relevant circumstances, I conclude that the scope of Hertzog's detention was reasonable. First, I find it significant that law enforcement had serious concerns about the existence of explosives in his residence. Given the proximity of his home to a school, the gravity of this concern cannot be overstated. Hertzog's own actions also contributed to his prolonged detention: he requested to confer with his attorney at 1:56 p.m. To fulfill this request, the officers transported Defendant to the Ferguson Township Police Station and contacted his attorney. Hertzog's attorney arrived at approximately 3:30 p.m. and proceeded to meet with him.[126] As the search warrant was eventually executed at 4:38 p.m.[127] and law enforcement discovered the first ammunition can at 4:57 p.m.,[128] I conclude that

---

[123] *Johnson*, 592 at 451.
[124] *Id.* at 452.
[125] *Id.*
[126] Doc. 72 (Evidentiary Hearing Transcript) at 49:1-4.
[127] Government's Ex. 1 (Footage of Search Warrant Execution) at 0:01:04.
[128] *Id.* at 0:07:15-0:07:21.

Hertzog's approximately three-hour detention was not unreasonable in scope under these facts. The eventual discovery of the ammunition in the detached garage, once considered alongside all the other relevant information, allowed Hertzog's further detention to be justified by probable cause. Consequently, I will not suppress the keys to Hertzog's house and detached garage.

### b.    The Contraband Discovered During the Search

The contraband in the detached garage was found pursuant to the execution of a valid search warrant. Accordingly, I will not suppress this evidence.[129]

### 4.    Hertzog's Alleged Statements

In his motion, Hertzog sought to suppress various statements he made to an officer while he was detained. Based on the representations of the Government, the Court will not address these arguments. Should this issue arise again in the future, the Court will address it at that time.

## III.   CONCLUSION

As discussed above, I conclude that both defense motions are properly denied. The Indictment contains sufficient allegations, and § 922(g)(1) is both facially constitutional and constitutional as applied to Hertzog. The search warrant was based on probable cause and was properly executed, and Hertzog's detention was a valid *Terry* stop that eventually became supported by probable cause.

---

[129]  Even if I concluded that Hertzog's detention was unconstitutional, the contraband found in the garage would not be suppressed. The independent source doctrine would serve to preserve this evidence. *See United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992).

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge